You can take your time to set up but I'll just call the case number 17-14804 Judas Alcocer v. Ashley Lynn Mills et al. Mr. Strickland whenever you're ready. May it please the court, I'm Rick Strickland and I represent Jailer Ashley Mills and Captain John Staten who was the jail administrator at the Bullock County Jail back in 2014. I've recently had another oral argument and Judge Anderson told me that you probably ought to lead with your best argument first and I thought that was good advice so I'll follow that. Even though it may not be exactly chronological, from the brief of the appellee, the appellee acknowledges this. It says here we are unable to locate precedent case law with facts that exactly match the facts in this case. We are unable to locate an 11th Circuit case where a plaintiff suffered a deprivation of her liberty due to officers ignoring overwhelming evidence that the detainee was an American born American citizen and yet held in anticipation of an ice hold. The exact facts of this case may be a case of first impression for this court. The district court and the plaintiff utilized some case law found in foreign districts for guidance with regard to determining the validity of an ice detainer for detention by law enforcement. Well, you've got a First Circuit case that I think helps you. Well, the First Circuit case, and I represent the appellants who Judge Hall denied summer judgment to. That cuts against you. Well, it does cut against me but there's a couple of points I would make about that. It's a little bit different but the principle of law there clearly cuts against you. It's different. It cuts against me. However, it was not decided until after the incident in this case anyway so it would not be of much use on a qualified immunity basis if it happened after the fact. Well, unless, I mean, let me say this before we get too far into it. I think there's a problem here because I don't see an individual analysis of each of the defendants which I will allow Appley's counsel to address when it's her turn. But having said that, it seems to me that at least under Fourth Amendment jurisprudence which I think governs here, that it is a very clearly established principle of law that you have to have probable cause to detain somebody. And there was a second detention here and so then the question becomes was there probable cause? And I think if there was an ICE detainer, there's at least arguable probable cause. But here we don't actually have an ICE detainer. We have this strange sheet of paper which says it's not based on fingerprints. She might be here in violation of the law. And we have all of these other countervailing pieces of evidence which clearly weigh the other way. And so I wonder if you want to address that. I was planning to address that and what I would say about that is I'm going to pick up first just briefly on what you said about the individualized determination. The bigger problem or a big problem for the plaintiff in this case is that with regard to Jailor Ashley Mills, she was not the one who made a determination that she would be held. She did the processing, informed her supervisor who then said put that in the file and then the record is admittedly not a model of clarity with regard to what happened once Ms. Kirkland made that determination and how the involvement of Captain Staten came to be. But that not said, I'm not sure that I agree with the court that the Fourth Amendment governs as opposed to the Fourteenth. It's an interesting issue and I don't know that there's any particular clarity there. Does that really help you in this case? Because she asserted both Fourth and Fourteenth Amendment claims. It's not like if she proceeded on the Fourth and you're arguing it's Fourteenth and so she loses because she brought the wrong claim. She brought them all. The district court was the one that said I think the Fourth Amendment governs and therefore I think the Fourteenth Amendment claims are duplicative. How does choosing one over the other help you at this stage of the proceeding? Well the standard is a little more difficult I believe under the Fourteenth Amendment. The deliberate indifference standard is going to be different with regard to the probable cause analysis under the Fourth Amendment. But here again, putting aside the individual consideration matter that Judge Rosenbaum mentioned, if you are shown evidence, potential evidence that shows that a person is a United States citizen and you refuse to look at it, it's not like if you look at it and then compare it and then make a phone call and then make a decision and you say the thing's in a flux, I don't know, we're not going to take any chances, we'll take the safe side, there's some deliberation. But if you just refuse to look at documents which show a person's nationality, why doesn't that at the summary judgment stage create a triable issue for a jury on deliberate indifference? Well, because I think with regard to even Supreme Court President Baker v. McCollum, the folks at the jail don't have the obligation to resolve whether or not there's enough there for a conviction because there wasn't. You may be correct about that, but it's one thing to not resolve it, it's another thing if you believe Ms. Alcocer's sister's testimony that they refused to look at it or consider it. Why does that not at least create a jury issue on deliberate indifference? Because the other language that was within the document from ICE that indicated that the subject appeared not to be in the country illegally, it may be subject to removal proceedings. That was what prompted, we can assume, Ms. Kirkland to make the decision that she did. I would get back to the reason it wouldn't create a tribal issue here is because it's conclusive in the record that Ms. Mills was not provided this information and that she was not spoken to about it even by the plaintiff or her sister. She made clear that it was not Ashley Mills or Sue White that she spoke to. She said she spoke to folks at the jail, they were female, so she didn't speak to Captain Staten. And then the sister, she came after Ashley Mills left that day at 7 o'clock. She was there at 3.30 when she was processed in. The sister did not come back until the next day, and so the defendant in this case . . . And was Ms. Mills there that next day or no? No. Ms. Mills left at 7 o'clock and she did not work the next day and the record is clear on that. So Ms. Mills had no interaction with Ms. Alcoser's sister, you're saying? She had none with Ms. Alcoser's sister. Captain Staten was the one who was making the decision, though, right? I mean, he was in charge of . . . the decision was his. We have notes in the record that are written on his behalf. I guess he was out of the office. Am I mistaken about that? I will say this, I wish the record was more clear on that, but Captain Staten was not there, but the booking documents, there is a notation in there attributing a statement to Captain Staten to, if they don't get information from ICE, to release her by a certain time. That's what it says in the record with regard to Captain Staten. He didn't provide anything in this record, an affidavit, a deposition? He provided a deposition, and he said he was not there, and that he had not seen those documents, and that's . . . But he could say he never saw the documents because somebody else wrote them, but did he remember making the decision to release her? No, he did not. That's not in the record that he did. He was asked specifically? No. Okay. He doesn't deny that he did it. I mean, he . . . the record . . . Not in the record. There's nothing . . . He does not in the record. Just to be clear, there's nothing in the record that contradicts the notes that say, per Captain Staten, blah, blah, blah, whatever, right? To be released. Yes. There is . . . No, that is not. That's . . . Okay. Why doesn't that present a flash that he didn't want to issue a material, if that's what it did? Because the document that led to this, from ICE, does provide some evidence, at least, of a reason to believe that the person is in the country illegally. It turns out that's certainly not the case. But I would say that this was similar to, in some regards, a hold for another jurisdiction that from time to time, when they call and say, hey, we're going to pick somebody . . . we're going to pick them up, and they're held to the other jurisdiction, gets there even though they let them post their bond on the charges in the one county, but the other county shows up, takes them based on their charges, and it would be similar to that. Not that it's . . . I don't know that there's any binding decision on this, but I understand what Judge Hall says about the Riverside case, and that certainly 48 hours is not a . . . it deals with whether a probable cause determination must be had. But fundamentally, I have a problem with an understanding, not your question, Judge Rosenbaum, but as Judge Hall put it, when this second arrest occurred that he refers to, and I don't see that there is this second arrest that . . . But it seems like, to me, the second arrest would have occurred when the bond was posted for the first one, and she continued to be detained. That's when the second arrest seems to me to have occurred, because the basis for her continuous detention would have been this elusive quasi-detainer from ICE. So that would be the second detention. Judge Hall referred to it as a second arrest, and what it looks like to me is that with regard to these types of cases, whether it's the fourth or fourteenth, and I understand what the court says, that may not ultimately matter, but as to which applies, is that Judge Hall clearly found there was probable cause for an initial arrest. She was not in there illegally, which all of these other cases that seem to say, and most recently the Manuel v. City of Joliet case, involved claims that there was no probable cause ever, to start with, to hold, and therefore there was not a cessation of the Fourth Amendment claim at that point. I think this is different where she's clearly in there for a legitimate reason, being held . . . But once she bonds out, I mean, had there not been a detainer by ICE, she would have been out, right? I mean, there's no question about that. Presumably, she would have been out. Okay, so she's not out. Why is she not out? Because of the alleged detainer from ICE, which doesn't actually exist. So, why is that not a second detention? Well, the circumstances haven't . . . I don't know that the circumstances have changed. Maybe it is a second detention. I don't ultimately think it matters because of the problems that we mentioned from the individualized assessment of each defendant. Where I think Judge Hall got it most wrong was where he repeatedly used the term defendants and there was no particularized assessment of each of the two actual defendants in this matter. All right, Mr. Frickland. Thank you very much. You've reserved your time for rebuttal. Ms. Lucas. Whenever you're ready. Thank you, Your Honor. My name is Beverly Lucas. I'm with Lucas and Leon and I'm here on behalf of the appellee today. This is my first appearance before this honorable court. I believe that there's been a lot of discussion about the detainer, the so-called detainer. Let me stop you for a second and I'm sorry to rush into your first appearance with a question, but it does seem to me like there is a problem that the district court did not conduct an individualized or a particularized analysis as to each of the defendants. Would you agree with that or are you contesting that? And if you do agree with that, what is your proposed solution? Should we send it back for the district court to do it in the first instance or are you asking us to conduct that analysis ourselves on the record that already exists? I think that this court is perfectly capable of making that assessment. I think the district court is perfectly capable of making that assessment. I do believe though that the district court did make that assessment. It did kind of lump them together, but if you take the order in its totality, I think he did address each of the defendants independently. How do you get to that? Because our case law is very clear, as is the Supreme Court's on this, that each defendant is entitled to an individualized or particularized assessment of the evidence against her or him without respect to the other defendants. So can you point us to the parts in the record where we could find that individualized assessment for each of the defendants here? I believe there is quite a bit of discussion about Ashley Mills being the detaining officer and what was her role and what was required of her. Definitely there's a lot of information about Mills. He does talk about Staten later on about how he sort of ratified Mills' decision and how he could have at any time stopped this whole thing. So maybe some of the details are not provided individually, but I believe that when he was doing some assessment there, he was lumping them together because both of them were responsible for the same duties. And I think that's how he got to that. So I think we're actually okay on that, but if this court finds not, we are absolutely in favor of further information regarding that. We think that either one will stand up to a denial of summary judgment for the defendants. In that respect, what do you think that Ms. Mills did that violated Ms. Alcocer's rights either under the Fourth or the Fourteenth Amendments? Ms. Mills was the detaining officer, so she had the role that she needed to investigate at least a little bit. There was information practically slapping her in the face, telling her that this is an American-born American citizen. What was that information? Ms. Alcocer provided a social security number. Her boss from Claxton Chicken called the jail. While Ms. Mills was there? Yes. Because she was, according to some of the evidence in the record, there may be something else, Ms. Alcocer was booked into the jail at around 5.45 in the afternoon. That actually is incorrect. She was booked at 3.30. So then there were about three plus hours that Ms. Mills had interaction? Yes, Your Honor. During that period of time, you're saying that she was given some documents by Ms. Alcocer herself and then had her boss call as well to speak to Ms. Mills? First of all, she had a driver's license. As we know, illegal aliens in this country are not allowed to, or at least in Georgia, are not allowed to obtain a driver's license. I know, but there's also the possibility that a license is fraudulent. Correct. And not legitimate. So I understand that that opens up a world of possibilities, but it's not determinative. Correct. And the appellants never made any accusation that that driver's license was faked or In fact, officers Norman and Muncy identified her at Clyde's store with that driver's license and was satisfied with that identification, even though on the record it was technically suspended. Now, when Ms. Hinojosa came in with the records, that was after Ms. Mills had already left and hadn't come back. That's correct. When she brought the records, she was told by R.T. Franks at ICE to bring the records in, but she was for hours sitting out in front protesting the fact that her sister was placed on an ICE hold. Right, but to be clear, Ms. Mills had already gone home and had not returned. Your position is not that Ms. Mills was shown these records and ignored them. Is that correct? But Ms. Mills did know that she had a driver's license, a valid tag. I understand that position, but Ms. Mills left at 7 o'clock that night. That's correct. As far as we know, and did not return. And the next day was when Ms. Hinojosa came in, right, with the records. Ms. Hinojosa was there that evening protesting, but she did not have the records on her at that time until the morning. So just to be clear, Ms. Mills was never shown and was not present when Ms. Hinojosa brought the records. Correct. Okay. I see my time is getting – You've got nine minutes. Oh, I do? Oh, okay. I'm sorry. I misunderstood the color. Okay, so there was a lot of talk from the appellants that this detainer was their arguable probable cause. We're talking about a facts document that actually says this is not a detainer. That was their first clue. The law says that even if ICE wants to hold someone, they must have probable cause in which to do so. They did not have probable cause. They knew that they didn't have – the appellants knew that ICE did not have probable cause because of the way the detainer was worded or the so-called detainer was worded. It said it was without the benefit of fingerprints. She had – Ms. Hinojosa had a Social Security number. There were three telephone numbers on that facts document for the appellants to call and get information about to say, hey, this lady has given me a Social Security number, and she claims to have been born in South Carolina. Can we recheck this? That's just a minuscule amount of time and effort that Ms. Mills could have taken in order to rectify this situation. In addition, Ms. Mills had at length conversation with her, as you can see in the deposition. She was asking her about her three young children and where they were going to go when she was deported. Ms. Alcaster had three young children ranging in ages from six to nine at that time, and they were at home crying for their mom. So with regard to Captain Staten, Captain Staten, I believe, was called twice according to the records. Oh, and let me just go back to Ms. Mills for one second. My opponent has mentioned several times that Officer Kirkland or Sergeant Kirkland was the one who made the decision. However, it's not noted in the inmate information sheet that Ms. Kirkland had any kind of interaction regarding this situation. If you'll note, Mills writes in her note that contact ICE at Atlanta for pickup before releasing. She does not say per Sergeant Kirkland, call ICE before releasing. But is there any evidence in the record that contradicts her position on that? I don't see anything in the record concerning Sergeant Kirkland on this record. Did she not? In the deposition, she did mention that she had a Sergeant Kirkland. I don't know that she said that she made the decision, but she said she took this information to Sergeant Kirkland. So is that contested anywhere in this record? No, but it's not affirmed either. Okay, but if there's nothing that contradicts it, is there any evidence that contradicts it in any way? Because if there isn't, then it's not a material issue of fact. I mean, it might be a material issue, but there's not a question of fact. Well, Ms. Mills claimed in deposition that she was trained on all of her jobs. And Sheriff Anderson indicated on his deposition that ICE training and immigration training was given to all of the deputies. So we can assume that Ashley Mills knew what she was doing when she did it, and that she had the authority to do what she did, and she did not have to go back to Sergeant Kirkland for authority. It is your argument that even if she did have to go to Sergeant Kirkland, she knew what was wrong and what was right? I do believe that Ashley Mills knew what was wrong and what was right. She had training, and she herself stated in her deposition, I've been trained on all of my jobs. She claims in deposition not to remember Ms. Alcaster whatsoever, that when she was shown a picture of Ms. Alcaster, she didn't remember her face. Yet she spent more than three hours with her and had a conversation about her children. So we just think it was a little bit convenient that she had no memory once we got her on deposition. Now, Captain Staten was called, it appears, twice from the record. Before you move on to that, let me just ask you a quick factual question. Do you know what time the bond was posted? So the bond was immediately obtained by the sister within an hour or two. Right. When was it posted? Well, they did not allow it to post until right before they released her. But they threw it in a file drawer as indicated by the inmate information sheet. And they say right here. When did the sister provide it for her release? Within an hour or two of her arriving at the jail. Okay. And where would we find that in the record? In the sister's deposition. That she spoke to the lady who said that everything was taken care of and that it was actually the bondsman that informed the sister that she was on a nice hold. That Alcaster was on a nice hold. Thank you. You're welcome. So Captain Staten twice affirmed, it seems that two different people spoke to him and he twice affirmed the actions of Mills or ratified. And we would assume that he knew all of the information and was in a position to ask for more information or even a copy of the facts. Was he asked at his deposition whether he was given any of this information? I'm sorry. I don't recall that. I'm sorry. I don't recall that at this point. If he was asked that directly. Staten didn't believe that Ashley Mills did anything wrong. He thought that there was a detainer in there and that's fine. He thinks that it's arguable probable cause that just because he got this fax document that she had every right to hold her indefinitely. And, in fact, Staten said that she could be released on Monday, and this was Thursday that she was being held. So it would have been an additional 48 hours before she was released, maybe even more than 48 hours before she was released. So everyone in this scenario, aside from Ms. Alcaster apparently, thought they were doing the right thing. I think they saw that she was Hispanic, made the determination that, of course, this is ICE. ICE knows what they're doing. We're going to hold her. And they really didn't give any other consideration to the facts or the information that was blatantly there for them to see had they just done a cursory investigation. I see that my time is getting short. What I did want to say is this morning on television, I noticed that the president was specifically saying that he did not want judges, did not like judges, didn't want them. And I think that in a case like this, judges become all the more important, especially as we determine what we're going to do about immigration. If an American-born American citizen can have her liberty taken from her by one simple piece of paper, that's shocking, and it shocks the consciousness of everyone concerned. Thank you, Your Honors. Thank you very much. Ms. Brinkley, you've saved all of your time for rebuttal. Thank you, Your Honor. I'll briefly address a couple of points that Ms. Lucas made. I don't think it's in the record that Ms. Mills spent three uninterrupted hours with Ms. Alcoster. That is simply not what's reflected in the record. The record reflects she spent about ten minutes with her, processing her in. And I apologize, in our original brief, for reasons we explained later in the reply brief, we had the time wrong, the 544 that Judge Jordan mentioned. It was actually around 3.30 when she came in, but we corrected that in the reply brief. It's pretty clear from the deposition testimony that it was not Ms. Mills, but a lady named Sue White that Ms. Alcoster had discussions with about family and other things. Without agreeing that what was represented was said, it's clear that those discussions were not with Ms. Mills. What did Ms. Mills say was her involvement? From her own words, what did she say happened during the deputed time? Other than she processed her in, which took about ten minutes, and that she may have been the one to take her fingerprints. She doesn't think that she was, but the plaintiff says that she took her fingerprints. But the fingerprints would have been submitted to a database that goes to various law enforcement databases. But she received this, and what's not clear from the record that we have is that the document was actually a teletype. This probably didn't all come at the same time. It may have come over a little drawn-out period. But she did ultimately print out the information, the hit or so, that they received from ICE that said the subject may be in the country illegally, but it also did say this is for information purposes only. She says she took that, gave it to Ms. Kirkland, and let Ms. Kirkland decide what was to be done at that point. Did she have any discussions with Ms. Alcazar about her citizenship, about her identification documents, anything? She did not. Does Ms. Alcazar say anything to the contrary? No, other than what Ms. Lucas said about that she had a driver's license. But the charge she was in there on was a suspended driver's license that she was arrested for initially. But other than that, no. I try to, and I don't want to anticipate what the court may or may not do, but from one of Judge Rosenbaum's questions, asking whether if there needed to be more development of the record, what should be done in the first instance. I would submit with regard to Ms. Mills that there would be no reason to resubmit the case to the district court. I'm not going to concede that it should be with regard to Captain Staten because I've often seen when lawyers, good lawyers or any lawyers, make concessions in front of this panel of the 11th Circuit, sometimes they get to read about it in the opinion. But certainly with regard to Ms. Mills, the record is conclusive as to her lack of involvement and she is certainly entitled to reversal. I believe that, and I would be remiss if I didn't also mention the City of Kingsland case which is relied upon by every lawyer in every case I have with law enforcement anymore. I know from a prior oral argument with you, Judge Jordan, that you were the district court judge in Kingsland. But this case is different from Kingsland. This does not involve law enforcement officers fabricating evidence. I understand the very broad language in the 11th Circuit's opinion in Kingsland about the reason to look and to investigate. But at some point, the expansion of Kingsland and the way that it has seemed to go is going to swallow up the rule on qualified immunity. So I think that there are material factual differences between Kingsland and this case that would not allow Kingsland to be the final answer, so to speak, on qualified immunity in this case. Thank you. Thank you very much, Mr. Strickland. We appreciate it.